1  **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7                  **FOR THE DISTRICT OF ARIZONA**

8

9   Denise M. Addie,                    )    No. CV-11-2534-PHX-SMM
                                        )
10            Plaintiff,                )
                                        )
11   v.                                 )    **MEMORANDUM OF DECISION AND**
                                        )    **ORDER**
12   American Family Mut. Ins. Co. et al., )
                                        )
13            Defendants.               )
                                        )
14   _____ )

15          Before the Court is Defendant American Family Mutual Insurance Company's Motion

16   for Partial Summary Judgment. (Doc. 101.) Plaintiff has responded and Defendant has

17   replied. (Docs. 105; 107.) For the reasons that follow, Defendant's motion is granted.[1]

18                              **BACKGROUND**

19          The material facts of this case are undisputed.[2] This diversity insurance action arises

20   out of a July 3, 2007, automobile accident in Truth or Consequences, New Mexico, in which

21   a parked vehicle occupied by Plaintiff Denise Addie ("Addie") was struck by another vehicle

22   that subsequently fled the scene. (Doc. 106 ¶¶ 1-4.) Consequently, a hit and run police report

23

_____

24          [1] Defendant's request for oral argument is denied because there was an adequate
25   opportunity to present written arguments, and oral arguments will not aid the Court's
     decisional process. LRCiv 7.2(f); Partridge v. Reich, 141 F.3d 920, 926 (9th Cir. 1998).
26

27          [2] Although Defendant objects to some of Plaintiff's facts on the bases of hearsay or
28   foundation, the content of the evidence could be presented in admissible form at trial and can
     therefore be considered. See Fed. R. Civ. P. 56(c)(2).

was filed. (Doc. 102-1 at 2-4.) Addie's vehicle was insured by a policy that Defendant American Family Mutual Insurance Company ("American Family") issued to Addie's brother, who resides in Arizona—the policy provided for payment of up to $100,000 in "compensatory damages for bodily injury which an insured person is legally entitled to recover from an owner or operator of an uninsured motorist vehicle." (Doc. 106 ¶¶ 7-9.)

On July 6, 2007, Addie reported the accident to American Family and that she was planning on seeking medical treatment for headaches and bodyaches. (Id. ¶¶ 11-13.) American Family evaluated and paid the claimed property damages. (Doc. 102 ¶ 5.) On July 16, 2007, American Family insurance adjuster Tana Stevens ("Stevens") explained the medical payment claims process and transmitted the appropriate forms to Addie. (Id. ¶¶ 6-7.) On August 13, 2007, Addie told Stevens that she had moved and needed the forms sent to her new address. (Id. ¶ 8.) Stevens spoke with Addie again on August 31, 2007, about paperwork and Addie stated that she knew the accident was "minor." (Id. ¶ 9.) On September 14, 2007, Stevens received signed medical authorizations and a copy of the police report. (Id. ¶ 10.) On September 19, 2007, and again on October 17, 2007, Stevens requested medical records from Addie's primary care provider. (Id. ¶ 11.)

On October 24, 2007, Stevens contacted Addie for a recorded statement, which should have been taken at the outset; Addie complied the following day. (Doc. 106 ¶¶ 15-17.) On November 12, 2007, Addie informed Stevens that she had spinal bulges in two adjacent cervical vertebrae; in turn, Stevens informed Addie that American Family would need x-rays that pre-dated the date of the accident. (Doc. 102 ¶ 12.) As Addie disclosed additional providers, Stevens updated American Family's records and on February 1, 2008, Stevens sent signed medical authorizations to Addie's additional medical providers. (Id. ¶ 13-14.)

On March 3, 2008, David Grothaus ("Grothaus") replaced Stevens as the adjuster of Addie's claim. (Id. ¶ 15.) On July 2, 2008, Addie informed Grothaus that she had undergone a total of 41 surgical procedures, nine of which related to a 2001 workers' compensation injury. (Id. ¶ 16.) After requesting a renewed medical authorization form, Grothaus referred Addie's claim to American Family's medical services department on August 15, 2008, for

1    a determination of whether Addie's injuries were related to the accident. (Id. ¶¶ 17-18.)

2    However, medical services specialist Karen Van Belle ("Van Belle") required additional

3    medical records to make the requested determination. (Id. ¶ 19.)

4         Between November 17, 2008, and March 4, 2009, Grothaus made eight attempts to

5    contact Addie about her treatments and medical problems, which led to two separate updates.

6    (Id. ¶¶ 20-22.) On April 15, 2009, Grothaus requested the additional medical records required

7    by the medical services department; those records were received the following month. (Id.

8    ¶¶ 24-25.) However, the records were still incomplete and Van Belle indicated an

9    independent medical examination ("IME") would be appropriate to determine the relatedness

10   and medical necessity of Addie's post-accident treatments. (Id. ¶ 25.) Grothaus continued to

11   acquire the relevant medical records from Addie's medical care providers. (Id. ¶¶ 26-27.)

12        In August 2009, Grothaus received correspondence from Gene Gulinson ("Gulinson")

13   stating that he had been hired to represent Addie. (Id. ¶ 28.) In a August 17, 2009, letter

14   acknowledging Gulinson was representing Addie, Grothaus disclosed that American Family

15   would be requesting Addie submit to an IME once Addie's medical records could be

16   assembled. (Doc. 106-1 at 27.) American Family retained Medical Management Online

17   ("MMO") to coordinate the IME, and on November 3, 2009, MMO sent Addie a letter

18   informing her that the IME was scheduled for December 8, 2009, in Phoenix, Arizona, with

19   Dr. Gary Dilla ("Dilla"). (Id. at 29.) Addie appeared for her IME. (Doc. 102 ¶ 31.)

20        The purpose of the IME was to determine: (1) what medical problems Addie attributed

21   to the accident; (2) whether those complaints, imaging findings, and treatments were

22   reasonable and causally related to the accident; and (3) whether all the diagnostic tests,

23   medical care, and procedures were medically necessary. (Doc. 102-1 at 160-62.) The same

24   day of the IME, Dr. Dilla opined that he could not conclusively determine the causal

25   relationship between the accident and Addie's claimed injuries because:

26        there was no immediate medical attention at the scene of this alleged motor vehicle
          accident. There is no police report. There is no emergency room note. In fact, there
27        are no medical notes regarding this incident or any pain complaints thereof for a
          period of a little over one month subsequent to the time frame of said accident.

28

- 3 -

(Doc. 106 ¶ 21.)[3] Thus, concluded Dr. Dilla, "the only causal relationship would be the claimant's subjective reporting that an accident occurred, and that she developed symptoms thereafter, which were not present prior. If one finds this history as credible, then there would be a causal relationship." (Id.)

When MMO asked for a clarification of his opinion on causation, Dr. Dilla explained that the accident could have caused Addie's injuries, but that he could not give any more definitive diagnosis without information documenting the specifics of the accident and the alleged injury. (Doc. 102-1 at 166.) MMO sent Dr. Dilla additional medical records and requested an addendum to his report opining about whether any of the new documents changed his opinion. (Doc. 102 ¶ 33.) On December 30, 2009, Dr. Dilla responded his opinion was unchanged and reiterated that causality rested on Addie's credibility. (Doc. 102-2 at 4-5.)

Meanwhile, Gulinson arranged for Addie to be examined by Dr. Marjorie Eskay-Auerbach on December 10, 2009. (Id. ¶ 24.) On December 28, 2009, Dr. Eskay-Auerbach concluded "[t]o a reasonable degree of medical probability, [Addie] became symptomatic . . . as a result of the accident in question." (Doc. 106-1 at 19.) The following day, Addie made her demand for tender of the policy's uninsured motorist ("UIM") limits. (Doc. 106 ¶ 27.)

On January 5, 2010, American Family retained a biomechanical engineer to opine about the force of the collision as the mechanism of Addie's injury. (Id. ¶ 28.) On March 25, 2010, the biomechanical engineer reported there was not sufficient information to render an opinion. (Id. ¶ 30.) Also, from January 6, 2010, to April 28, 2010, Grothaus corresponded with Gulinson about obtaining Addie's additional medical records. (Doc. 102 ¶¶ 34-36.) On May 7, 2010, American Family requested records for Addie's 11 prior car accidents and workers' compensation claims. (Doc. 106 ¶ 31.)

On June 9, 2010, MMO transmitted the additional medical records to Dr. Dilla and requested another addendum to his report again asking whether any of the documents

---

[3] Apparently, the police report was not given to Dr. Dilla at this time.

changed his earlier opinion. (Doc. 102 ¶ 39.) In his fourth and final addendum dated July 28, 2010, Dr. Dilla explained that none of the additional medical records suggested that Addie's spinal injury symptoms developed before the accident, and therefore his earlier opinion as to causation remained unchanged. (Doc. 102-2 at 24-25.) Dr. Dilla did note, however, that it appeared that Addie may have attempted to try to claim that her neck injury was related not only to the accident in question, but also an earlier accident from 2001. (Id. at 22-23.) Dr. Dilla also noted that imaging studies performed after the accident did "not show pathology which would correlate with [Addie's] ongoing subjective symptoms." (Id. at 24.) From June 2010 to September 2010, Grothaus and Van Belle continued to try to obtain Addie's medical records. (Doc. 102 ¶¶ 40-42.)

On September 29, 2010, American Family offered Addie $1,000 to settle her claim taking the position that the accident was minor and Addie did not mention the accident or any neck pain to a medical provider for four weeks. (Doc. 106 ¶ 42.) Alternatively, American Family offered to submit to arbitration. (Doc. 102 ¶ 43.) On March 3, 2011, Grothaus sent Gulinson a letter regarding the settlement offer, and the two corresponded about the matter from April 2011 to September 2011. (Id. ¶ 44-45.) Ultimately, Addie rejected American Family's settlement offer.

On November 18, 2011, Addie filed suit in Maricopa County Superior Court alleging one count of breach of contract for failing to pay the policy limits and one count of bad faith for lacking a reasonable basis to refuse such payment. (Doc. 1-1 at 1-6.) American Family removed on the basis of diversity. (Doc. 1.) American Family now moves for summary judgment on Addie's claim for bad faith and on the issue of punitive damages.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The substantive law determines which facts are material; only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." Nat'l Ass'n of Optometrists & Opticians v. Harris, 682

1  F.3d 1144, 1147 (9th Cir. 2012) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

2  (1986)). For a dispute to be genuine, the evidence must be "such that a reasonable jury could

3  return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.

4        The movant bears the initial burden of proving the absence of a genuine issue of

5  material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). When the non-movant

6  would bear the burden of proof at trial, the movant can satisfy its initial burden either by

7  producing evidence that negates an essential element of the non-movant's case or by showing

8  the absence of evidence to support non-movant's case. <u>Id.</u> If the movant satisfies that burden,

9  then the non-movant must designate specific evidence in the record from which a jury could

10 reasonably render a verdict in her favor. <u>Id.</u> at 324.

11       In ruling on a summary judgment motion, "[t]he evidence of the non-movant is to be

12 believed, and all justifiable inferences are to be drawn in [the non-movant's] favor."

13 <u>Anderson</u>, 477 U.S. at 254. To determine whether a party carried its burden "[t]he court need

14 consider only the cited materials." Fed. R. Civ. P. 56(c)(3). If a party fails to address the

15 other party's assertion of fact, the court may "consider the fact undisputed for purposes of

16 the motion." <u>Id.</u> 56(e)(2).

17       "A federal court sitting in diversity must look to the forum state's choice of law rules

18 to determine the controlling substantive law." <u>Zinser v. Accufix Research Inst., Inc.</u>, 253

19 F.3d 1180, 1187 (9th Cir. 2001). Arizona, the forum state in this case, follows the

20 <u>Restatement (Second) of Conflict of Laws</u> (1971) to resolve choice of law questions. <u>Cardon</u>

21 <u>v. Cotton Lane Holdings, Inc.</u>, 173 Ariz. 203, 206, 841 P.2d 198, 201 (1992). In Arizona, an

22 insured's cause of action against an insurer for breaching the implied covenant of good faith

23 and fair dealing lies in tort. <u>Noble v. Nat'l Am. Life Ins. Co.</u>, 128 Ariz. 188, 189, 624 P.2d

24 866, 867 (1981). The parties agree that Arizona law should govern the bad-faith claim

25 because the allegedly tortious conduct and resultant injury occurred in Arizona, the parties

26 relationship was centered in Arizona, and American Family reasonably believed Arizona law

27 would govern its conduct. (Docs. 112, 113, 114.) The Court agrees. <u>See, e.g.</u>, <u>Bates v.</u>

28 <u>Superior Court of Maricopa County</u>, 156 Ariz. 46, 50-51, 749 P.2d 1367, 1370-71 (1988).

1    "An insurer acts in bad faith when it unreasonably investigates, evaluates, or processes

2    a claim (an 'objective' test), <u>and</u> either knows it is acting unreasonably or acts with such

3    reckless disregard that such knowledge may be imputed to it (a 'subjective' test)." <u>Nardelli</u>

4    <u>v. Metro. Grp. Prop. & Cas. Ins. Co.</u>, 230 Ariz. 592, 597-98, 277 P.3d 789, 794-95 (App.

5    2012) (emphasis added). The objective prong tests for reasonableness—whether the insurer

6    acted "in a manner consistent with the way a reasonable insurer would be expected to act

7    under the circumstances." <u>Trus Joist Corp. v. Safeco Ins. Co. of Am.</u>, 153 Ariz. 95, 104, 735

8    P.2d 125, 134 (App. 1986). An insurer acts reasonably when it has an objectively reasonable

9    basis for its conduct. <u>Zilisch v. State Farm Mut. Auto. Ins. Co.</u>, 196 Ariz. 234, 237, 995 P.2d

10   276, 279 (2000); <u>Lennar Corp. v. Transamerica Ins. Co.</u>, 227 Ariz. 238, 245, 256 P.3d 635,

11   642 (App. 2011). "Where an insurer acts reasonably, there can be no bad faith." <u>Trus Joist</u>,

12   153 Ariz. at 104, 735 P.2d at 134.

13   The subjective prong tests for the mental state required to "elevate[] bad faith to a

14   quasi-intentional tort." <u>Trus Joist</u>, 153 Ariz. at 104, 735 P.2d at 134. "Mere negligence or

15   inadvertence is not sufficient," <u>Rawlings v. Apodaca</u>, 151 Ariz. 149, 160, 726 P.2d 565, 576

16   (1986); rather, "[s]ome form of <u>consciously</u> unreasonable conduct is required." <u>Trus Joist</u>,

17   153 Ariz. at 104, 735 P.2d at 134 (emphasis added). The insurer is conscious of its

18   unreasonable conduct if it either knew its actions lacked a reasonable basis or acted with

19   sufficiently reckless disregard as to whether it had a reasonable basis for its conduct.

20   <u>Nardelli</u>, 230 Ariz. at 598, 277 P.3d at 795. An insurer's subjective belief is ordinarily "a

21   question of fact to be determined by the jury." <u>Zilisch</u>, 196 Ariz. at 237, 995 P.2d at 279

22   (quoting <u>Sparks v. Republic Nat'l Life Ins. Co.</u>, 132 Ariz. 529, 539, 647 P.2d 1127, 1137

23   (1982)); <u>accord Lennar</u>, 227 Ariz. at 245, 256 P.3d at 642.

24   If the insured fails to designate evidence from which a jury could reasonably return

25   a verdict on both prongs, then summary judgment is proper. <u>Lasma Corp. v. Monarch Ins.</u>

26   <u>Co. of Ohio</u>, 159 Ariz. 59, 64, 764 P.2d 1118, 1123 (1988) (holding court erred in allowing

27   fairly debatable bad faith claim to go to jury); <u>see</u> <u>Desert Mountain Props. Ltd. P'ship v.</u>

28   <u>Liberty Mut. Fire Ins. Co.</u>, 225 Ariz. 194, 215-16; 236 P.3d 421, 442-43 (App. 2010); <u>Regal</u>

1   Homes, Inc. v. CNA Ins., 217 Ariz. 159, 170-71, 171 P.3d 610, 621-22 (App. 2007).

2       Recovery of punitive damages requires " 'something more' than the conduct necessary
3   to establish the tort" of bad faith. Rawlings, 151 Ariz. at 161, 726 P.2d at 577. This
4   "something more" is clear and convincing evidence that the insurer engaged in "aggravated
5   and outrageous conduct" with an "evil mind." Linthicum v. Nationwide Life Ins. Co., 150
6   Ariz. 326, 332, 723 P.2d 675, 681 (1986); accord Rawlings, 151 Ariz. at 162, 726 P.2d at
7   578. An "evil mind" can be established by evidence from which a jury can reasonably infer
8   that the insurer intended to injure plaintiff, or that the insurer deliberately "pursued a course
9   of conduct knowing that it created a substantial risk of significant" injury to plaintiff.
10  Rawlings, 151 Ariz. at 162, 726 P.2d at 578. Whether conduct involves an element of outrage
11  is a flexible fact-specific inquiry, but some generally intolerable categories of conduct
12  include fraud, " 'deliberate, overt and dishonest dealings,' 'oppressive conduct' and 'insult
13  and personal abuse.' " Id. at 163, 726 P.2d at 579 (quoting Farr v. Transamerica Occidental
14  Life Ins. Co., 145 Ariz. 1, 8-9, 699 P.2d 376, 383-84 (App. 1984)).

15                                  **DISCUSSION**

16  **I.    Bad Faith**

17      American Family argues that its evidence negates the first element of Addie's bad
18  faith claim. (Doc. 101 at 13.) Specifically, that the circumstances of the accident and Addie's
19  extensive and complicated medical history required investigation into whether Addie's neck
20  injuries were caused by the accident, or by a previous injury. Relying principally on the
21  opinions of Addie's own bad faith expert, Suzanne Gainer, American Family contends that
22  notwithstanding a reasonable investigation, the evidence on causation is equivocal. American
23  Family concludes this causal uncertainty provided a reasonable basis for its conduct.

24      Ms. Gainer's report stated that given Addie's prior accident history, "whether her neck
25  injuries were indeed causally related to this [accident] was indeed debatable," and that it was
26  "reasonable for American Family to investigate and review her prior medical records." (Doc.
27  102-2 at 104.) Ms. Gainer further opined it was "reasonable for American Family to seek an
28  [IME] from Dr. Dilla" regarding the causal uncertainty. (Id.) During her deposition, Ms.

Gainer testified that Dr. Dilla did not find "to a reasonable degree of medical probability" that the accident caused Addie's neck injuries. (Id. at 110.) Ms. Gainer also testified that the credibility of Addie about the accident is "key" to the determination of causation. (Id. at 111.) American Family argues it had five reasons to question causation and Addie's credibility.

First, on August 3, 2007, Addie did not mention the car accident or any neck or upper extremity pain to a doctor she saw shortly after the accident. (Doc. 102-1 at 44; 102-2 at 46.) Ms. Gainer testified that it would be reasonable to consider Addie's failure to mention neck or extremity pain to this doctor in assessing credibility. (Doc. 102-2 at 115-16.) Second, on August 7, 2007, Addie did mention the car accident and did complain of neck and upper extremity pain four days later, when she saw her primary care provider. (Doc. 102-1 at 13.) Third, although Addie was complaining of neck pain in February 2008, she did not mention this to a spinal surgeon from which she was receiving treatment at that time. (Id. at 158.) Ms. Gainer testified that it would be reasonable for a claim evaluator to consider this fact in assessing credibility. (Doc. 102-2 at 112-13.)

Fourth, on February 3, 2009, Addie reported to the spinal surgeon that numbness and tingling in her hands began 14 months after the accident. (Doc. 102-1 at 158.) Ms. Gainer testified it would be reasonable to consider this fact in assessing causation. (Doc. 102-2 at 113-14.) Fifth, Dr. Dilla opined in his December 17, 2009, addendum that he could understand skepticism about whether Addie's injuries were caused by the accident, especially considering Addie's first medical visit after the accident on August 3, 2007. (Doc. 102-1 at 165.) Again, Ms. Gainer testified that it would be reasonable to consider this fact in assessing Addie's credibility and in determining causation. (Doc. 102-2 at 117.)

American Family asserts the undisputed facts establish it had a reasonable basis to investigate causation, and also that it diligently and fairly investigated Addie's claim notwithstanding a complex and extensive medical history and multiple delays by Addie, her attorney, and her medical providers. The investigation uncovered evidence that gave American Family a reasonable basis to doubt Addie's claim that her injuries were caused by

1    the accident. Thus, concludes American Family, its conduct was reasonable.

2         The Court finds that American Family carried its initial burden of proof by producing

3    evidence that negates the first prong of Addie's bad faith claim, viz., American Family had

4    an objectively reasonable basis for its conduct. Zilisch, 196 Ariz. at 237, 995 P.2d at 279;

5    Rawlings, 151 Ariz. at 160, 726 P.2d at 576. The burden shifts to Addie to come forward

6    with "significantly probative" evidence, Anderson, 477 U.S. at 249, that American Family's

7    conduct was inconsistent with the way a reasonable insurer would be expected act under the

8    circumstances, Trus Joist, 153 Ariz. at 104, 735 P.2d at 134. Addie fails to carry this burden.

9         Although Addie neither disputes any of American Family's facts nor cites any of Ms.

10   Gainer's report or testimony, Addie argues that three facts are evidence from which a jury

11   could infer American Family unreasonably delayed the resolution of her claim. (Doc. 105 at

12   16-17.) First, American Family rejected the conclusions of Dr. Dilla and Addie's own

13   medical expert, Dr. Eskay-Auerbach. (Doc. 105 at 11-13.) Second, American Family retained

14   a biomechanical engineer in hopes of persuading Dr. Dilla to change his opinions. (Id. at 13)

15   Third, American Family's investigation into Addie's medical history—particularly her

16   previous neck complaints—was a misguided attempt to discredit her. (Id. at 13-16.)

17        In effect, Addie advances two lines of argument. The first fact and inference suggests

18   it was objectively unreasonable for American Family to investigate causation whatsoever

19   after receiving Dr. Dilla's and Dr. Eskay-Auerbach's reports. Implicit in this argument is the

20   assumption that it was unreasonable for American Family to doubt Addie's credibility and

21   that the reports foreclosed the causation issue. The second two facts and inferences suggest

22   the breadth and depth of the investigation was unreasonable. Both arguments lack substance.

23        Addie concedes that Dr. Dilla opined the accident could have caused Addie's injuries

24   and that causation depended on Addie's credibility. (Doc. 105 at 12-13.) Addie speculates

25   that the only basis for Dr. Dilla's doubt about her credibility is that he was not furnished with

26   a copy of the police report. Addie offers no evidence in support of her speculation, nor does

27   she cite any evidence from which it could rationally be inferred that it was unreasonable for

28   American Family to question her credibility or to investigate causation.

1    To the contrary, it is undisputed that Dr. Dilla and Dr. Eskay-Auerbach reached

2    different conclusions about whether the accident caused Addie's injuries: Dr. Dilla

3    conditioned causation on Addie's credibility, but Dr. Eskay-Auerbach credited Addie's

4    version of events.[4] Addie's expert agreed with American Family's expert that credibility was

5    key and that it was reasonable for American Family to investigate credibility and causation

6    given the circumstances. (Doc. 102-2 at 104, 109, 133-34.) The experts further agreed that

7    there were several inconsistencies and discrepancies that American Family could consider

8    in assessing Addie's credibility and in determining causation. Although Addie alleges that

9    American Family ignored the contents of the medical opinions and should have known the

10   accident was a contributory cause of injury, she offers no evidence that a reasonable insurer

11   would not have investigated causation and credibility. Thus, Addie's first argument fails.

12   The bulk of American Family's investigation was the collection and examination of

13   Addie's medical records to determine whether there was evidence of a prior injury. It is

14   undisputed that this method of investigation was reasonable. (Id. at 109.) Addie asserts that

15   the temporal scope of this investigative method was unreasonably broad. In support, Addie

16   cites Dr. Dilla's third addendum in which he states he would "have expected significant

17   complaints of neck pain or abnormal physical examination when seen by [her] physical

18   medicine and rehabilitation specialist." (Doc. 105. at 15.) Dr. Dilla nonetheless expressly

19   withheld a conclusive opinion regarding causation despite an apparent "temporal

20   relationship." (Doc. 102-2 at 24-25.) Addie's over-breadth argument ultimately relies on the

21   premise that Dr. Dilla's equivocal statements on causation foreclosed any reasonable basis

22   to question Addie's credibility. Addie cites no evidence in support of her assertion that

23   reasonable insurers would have resolved credibility and causation in her favor at any point.

24   Addie also argues the depth of investigation was unreasonable. The only other method

25   of investigation was the retention of a biomechanical engineer to opine about the force of the

26   _____

27   [4] The experts' disparate treatment of Addie's credibility as to causation is immaterial
     to bad faith unless there is evidence that a reasonable insurer would have resolved that

28   disparity in Addie's favor. Addie designates no such evidence.

1   collision. Addie does not claim that this is an unreasonable investigative method, but argues
2   the engagement of the engineer is evidence that American Family was attempting to persuade
3   Dr. Dilla to change his opinion. Again, Addie fails to designate any evidence that a
4   reasonable insurer would not have retained a biomechanical engineer. Since speculation is
5   not enough to preclude summary judgment, Addie's second argument fails. See Getz v.
6   Boeing Co., 654 F.3d 852, 865 (9th Cir. 2011).

7       To the extent that Addie argues that it was unreasonable for American Family to wait
8   nine months after Addie made her demand before making any offer, she ignores the
9   undisputed facts. Her attorney, Gulinson, prevented American Family from getting additional
10  medical records from January 6, 2010, to April 28, 2010, by arguing the scope of medical
11  authorization was too broad. (Doc. 102 ¶¶ 34-26.) After receiving the authorization,
12  American Family requested the medical records on May 7, 2010, and gave those records to
13  Dr. Dilla for examination on June 9, 2010. (Id. ¶¶ 37-39.) On July 28, 2010, Dr. Dilla
14  explained he could not give a more definite opinion without supplemental "clearcut medical
15  documentation." (Doc. 102-2 at 22.) On August 5, 2010, and again on August 12, 2010,
16  American Family requested additional medical records before ultimately making its $1,000
17  offer. (Doc. 102 ¶¶ 39, 41-42.) Absent any evidence that American Family's conduct
18  between demand and offer was unreasonable, Addie's argument is not just unsubstantiated,
19  but is also contrary to the only expert opinion on the matter. (See Doc. 102-2 at 133.)

20      Addie's remaining allegations are similarly conclusory and insubstantial, such as
21  American Family's investigation was adversarial and sought to discover only the evidence
22  that would defeat Addie's claim, or that American Family subordinated Addie's interests to
23  its own. Likewise, Addie designates no evidence in support of her conclusion that a
24  reasonable insurer would not have extended her a settlement offer of $1,000.

25      At most, Addie establishes that American Family could have resolved her claim
26  favorably. However, the relevant issue is not what a reasonable insurer could do, but what
27  a reasonable insurer would have done. It is undisputed that a reasonable insurer would have
28  investigated causation and that review of Addie's medical records was a reasonable

investigative method. It is further undisputed that the investigation uncovered multiple inconsistencies and discrepancies that a claims evaluator could reasonably consider in evaluating Addie's credibility about the cause of her injuries. These undisputed facts establish that American Family had a reasonable basis for disputing the validity of Addie's insurance claim. In this fashion, American Family established its conduct was reasonable.

Addie's burden was to come forward with evidence that American Family did something inconsistent with what a reasonable insurer under the circumstances would have done. She argues that a reasonable insurer would have resolved credibility and causation in her favor; requested fewer medical records; not retained a biomechanical engineer; taken less time to extend an offer; or offered more money. Critically, Addie offers no evidence whatsoever about what a reasonable insurer would or would not have done. In the absence of evidentiary support, Addie's arguments about the actions of reasonable insurers are mere conjecture and insufficient to survive a properly supported motion for summary judgment.

It is worth noting that the types of evidence that suggest bad faith are conspicuously absent from this case. See Voland v. Farmers Ins. Co. of Ariz., 189 Ariz. 448, 453, 943 P.2d 808, 813 (App. 1997). There was no "deceit, nondisclosure, reneging on promises, violation of industry custom and deliberate attempts to obfuscate." Rawlings, 151 Ariz. at 161, 726 P.2d at 577. Nor did American Family give a "groundless" or inadequately investigated reason for its position. Lange v. Penn Mut. Life Ins. Co., 843 F.2d 1175, 1182 (9th Cir. 1988). Moreover, there is no evidence that American Family: set arbitrary goals for minimizing payment of claims; gave incentives to its claims handlers to achieve those goals; delayed evaluating Addie's claim despite having all of her medical records; or was presented with unequivocal medical evidence from four physicians that contradict the justification that American Family gives for its conduct. See Zilisch, 196 Ariz. at 280-81, 995 P.2d at 238-39.

As there is no evidence that any of American Family's conduct was inconsistent with what a reasonable insurer would have done under the circumstances, there is no basis for a jury to conclude that American Family's conduct was unreasonable. Therefore, American Family is entitled to summary judgment on the bad faith claim.

1    ///

2    **II.    Punitive Damages**

3          Addie brought two claims in her complaint: breach of contract and bad faith. (Doc.

4    1-1 at 2-6.) Since the Court is granting American Family summary judgment on Addie's bad

5    faith tort claim, only the breach of contract claim remains.

6          In Arizona, punitive damages cannot be recovered for breach of contract unless the

7    breach constitutes a tort. Lerner v. Brettschneider, 123 Ariz. 152, 156, 598 P.2d 515, 519

8    (App. 1979); accord Restatement (Second) of Contracts § 355 (1981); see Restatement

9    (Second) of Torts § 908 cmt. b (1979) ("Punitive damages are not . . . permitted merely for

10   a breach of contract."); cf. Gurule v. Ill. Mut. Life and Cas. Co., 152 Ariz. 600, 602, 734 P.2d

11   85, 87 (1987) ("[T]he propriety of awarding punitive damages turns upon the defendant's

12   state of mind.").

13         Addie's breach of contract claim alleges that American Family failed to pay benefits

14   that it was contractually obligated to pay. That allegation does not state a tort claim but states

15   a "mere" breach of contractual duty. There is thus no basis upon which Addie can recover

16   punitive damages.

17         Accordingly,

18         **IT IS HEREBY ORDERED granting** American Family's Motion for Partial

19   Summary Judgment. (Doc. 101.)

20         DATED this 10th day of June, 2014.

21

22

23                                        Stephen M. McNamee
                                    Senior United States District Judge
24

25

26

27

28